**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DEBRA LYNN FOSTER,

         CASE NO. 15-11133
    *Plaintiff*,      DISTRICT JUDGE DAVID M. LAWSON
*v.*           MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

    *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 9, 11)**

**I.**    **RECOMMENDATION**

    In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Foster is not disabled. Accordingly, **IT IS RECOMMENDED** that Foster Motion for Summary Judgment (Doc. 9) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 11) be **GRANTED**, and that this case be **AFFIRMED**.

**II.**    **REPORT**

    **A.**    **Introduction and Procedural History**

    Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*. and the Disabled Widow's Benefits ("DWB") program of Title

II, 42 U.S.C. § 402(e). (Doc. 2; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11).

Plaintiff Debra Foster was fifty-three years old as of December 9, 2011, her amended date of alleged disability. (Tr. 15). Her applications for benefits were initially denied on October 12, 2012. (Tr. 80-88). Foster requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Ramona L. Fernandez on November 7, 2013. (Tr. 29-47). Foster, represented by attorney Harry Keller, testified, as did vocational expert ("VE") John Stokes. (*Id*.). On January 3, 2014, the ALJ issued a written decision in which she found Foster not disabled. (Tr. 9-24). On February 4, 2015, the Appeals Council denied review. (Tr. 1-3). Foster filed for judicial review of that final decision on March 26, 2015. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.        Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

For a widow to qualify for disabled widow benefits (DWB), the widow must show: (1) she is the widow of a wage earner who died fully insured, (2) she has attained the age of fifty but not yet sixty, (3) she is disabled as defined in the social security statute, and (4) her disability began before the end of the prescribed period. 42 U.S.C. § 402(e); 20 C.F.R. § 404.335. As with other claims, a widow must show that she is under a disability as defined by the Social Security Act. 42 U.S.C. § 423(a) & (d), 1382c(a).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Foster not disabled under the Act. (Tr. 24). The ALJ found at Step One that Foster had not engaged in substantial gainful activity following the alleged onset date, December 9, 2011. (Tr. 15). The ALJ also found that Foster, who had reached the age of fifty and was an unmarried widow of an insured worker, was eligible to receive DWB through August 31, 2016. (*Id*.). At Step Two, the ALJ concluded that Foster had the following severe impairments: "status-post rotator cuff repair; degenerative joint disease of the knees; status-post right total knee replacement; and osteoarthritis of the right hip." (*Id*.). At Step Three, the ALJ found that Foster's combination of impairments did not meet or equal one of the listed impairments. (Tr. 16). The ALJ then found that Foster had the residual functional capacity ("RFC") to perform sedentary work, except that Foster "except that she can occasionally climb, stoop, crouch, and balance; no kneeling, crawling, or using ladders, ropes, or scaffolds; occasional reaching with the left (non-dominant) upper extremity; and must avoid concentrated exposure to extreme cold and wetness." (Tr. 17-23). At Step

5

Four, the ALJ found that Foster was able to return to her past relevant work as head cashier. (Tr. 23-24).

### E.    Administrative Record

#### 1.    Medical Evidence

Foster sought treatment for depression and anxiety in September 2011, but did not seek mental health treatment thereafter. (Tr. 257-68). The ALJ found that Foster did not suffer from any severe mental impairment, and Foster does not challenge that assessment in her brief. (Tr. 15-16). Consequently, the Court will limit its examination of Foster's medical records to those relating to physical ailments.

The Court also notes that a portion of Foster's medical records were submitted following the ALJ's decision, and thus have no bearing on the merits of the ALJ's opinion. (Tr. 491-528) Evidence submitted after the ALJ's decision may only be considered for purposes of determining whether remand is appropriate under sentence six of 42 U.S.C. § 405(g). *See Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003). Plaintiff does not move for a sentence six remand here, thus this evidence will not be considered. Additionally, a single record not relating to Foster was accidentally submitted as part of the record, and will also not be considered. (Tr. 485-90).

A November 2011 MRI examination of Foster's shoulder showed mild acromioclavicular joint arthropathy, a full thickness tearing of the supraspinatus extending into a moderate to high grade partial tear of the subscapularis, and underlying rotator cuff tendinosis. (Tr. 335).

6

In early December 2011, D.O. Richard Bartholomew examined Foster, finding that she experienced severe shoulder pain for around a year, and that injections helped to relieve pain, but did not offer permanent relief. (Tr. 331-33). Foster also experienced some numbness and tingling in the upper left extremity, and had pain at night and when performing activities overhead. (*Id*.). Dr. Bartholomew noted a slightly retracted tear of the supraspinatus, bicep tearing and tendinopathy, along with a tear of the superior to mid portion of the subscapularis, and a type two acromion process. (*Id*.). He recommended surgical repair of the tear. (*Id*.). Foster underwent an arthroscopic left rotator cuff repair including upper border subscapularis, arthroscopic bicep tenotomy, and arthroscopic extensive debridement and subacromial decompression. (Tr. 332).

In mid-December 2011 Foster began physical therapy treatment of her left arm pain. (Tr. 297). Foster reported symptoms began following her December 9, 2011, surgery to repair a rotator cuff, which was performed to remedy shoulder pain which began about a year prior. (Tr. 297). She was taking Percocet for pain and wearing a sling. (*Id*.). Foster's pain ranged from zero to seven out of ten, she was unable to lift any weight, and suffered tenderness on palpation of the muscles surrounding the left shoulder. (*Id*.). She had full strength in her upper right extremity, but the upper left extremity was not tested. (*Id*.). Her prognosis and rehabilitation potential were both "good." (Tr. 298). Foster had trouble sleeping because of shoulder pain. (Tr. 294). She also reported shoulder pain after wrapping gifts for three hours. (Tr. 295). Later that month, Foster

7

reported two out of ten pain in her left shoulder, she could wash dishes and drive due to her reduced pain, but still had difficulty with sleep. (Tr. 292-93).

In early January 2012, Foster reported soreness and stiffness in the left shoulder, but other times reported improved symptoms. (Tr. 289-91). Foster reported improved left shoulder symptoms, and was able to wash the top of her head. (Tr. 284-86).

In a January 2012 treatment report, Foster's physical therapist wrote that Foster complained of three to four out of ten pain in her left shoulder, with overall functioning at forty-five percent of normal. (Tr. 287). She could lift dishes, but had difficulty lifting her six pound grandchildren. (*Id.*). Dr. Bartholomew found that Foster was "having significant aching about her shoulder," with internal rotation that was "quite limited." (Tr. 325). He provided Foster with a disability certificate stating that she would be unable to work through February 19, 2012. (Tr. 326).

Early in February 2012 Foster reported improved shoulder symptoms. (Tr. 283). Foster then reported general soreness during a February 2012 physical therapy session, but was able to make progress on strengthening exercises. (Tr. 277). Foster reported that her shoulder was "getting better overall," but with continuing tenderness in the anterior shoulder, and with no increased discomfort. (Tr. 278-79). Foster returned to sleeping in bed following her surgery, and reported some left shoulder soreness, tenderness in biceps and triceps, and tightness with abduction. (Tr. 282). In mid-February 2012 Dr. Bartholomew found good range of motion in Foster's left shoulder, with limited strength in the rotator cuff. (Tr. 323).

8

In a late February 2012 treatment report, Foster's physical therapist wrote that Foster experienced five out of ten pain, along with some stiffness, but that she retained eighty percent of her normal functioning. (Tr. 280). Foster could shower, dress, cook, and clean normally, and could lift her six pound grandchildren, pots, pans, and dishes without difficulty. (*Id*.).

In March 2012 Foster attended physical therapy for the treatment of enthesopathy of the shoulder, bursa, and tendon disorders. (Tr. 276). Foster reported soreness and stiffness in the left shoulder, but noted an overall improvement in symptoms. (*Id*.). Foster had increased mobility, but with tenderness in upper trapezial muscles and the pectorals. (*Id*.).

Later in March 2012, Foster was discharged from her physical therapy program, having attended nineteen sessions, but having missed thirteen sessions "following a family emergency." (Tr. 275). Her prognosis was fair, and she was found to have partially achieved all goals. (*Id*.). Dr. Bartholomew found that Foster was "doing well, making good progress with her shoulder," that she had a good range of motion, but lacked the terminal aspects of internal rotation. (Tr. 321).

A July 2012 MRI of Foster's right knee showed some tricompartmental osteoarthritis changes, with no remarkable defects of the right hip or right ankle. (Tr. 318). That same month, Dr. Bartholomew noted severe degenerative joint disease of the bilateral knees, with greater changes to the right knee than left; surgery was recommended for the right knee. (Tr. 319).

9

In August 2012 Foster underwent knee surgery by way of right knee total knee arthroplasty. (Tr. 344). Her preoperative and postoperative diagnoses both reflect "[s]evere degenerative joint disease." (Tr. 347). Radiological examination of Foster's right knee post-surgery showed no evidence of any acute complication. (Tr. 366-67).

In early September 2012 Foster reported some stiffness and soreness in her knee, along with a lack of range of motion. (Tr. 307-08). Her condition was evaluated, and it was noted that she complained of pain between zero and eight out of ten, that she could walk for fifteen minutes outside with the use of a rolling walker, and that she could climb stairs. (Tr. 310). Both her left and right knees showed strength between four and five out of five upon flexion and extension. (*Id*.). Her prognosis and rehabilitation potential were both rated as "good." (Tr. 311).

In September 2012 Foster's knee pain was reduced to three out of ten, but as to mobility, she had "not attempted more than household distance" without the use of a rolling walker. (Tr. 303). She was tender over the lateral joint line, and had only attempted walking a few times post-surgery. (Tr. 305). However, Foster was able to complete all exercises without aggravation. (*Id*.). She later complained of knee soreness "with ambulation over distances" such as "to the grocery store." (Tr. 451).

In October 2012 Foster complained of lateral knee discomfort. (Tr. 452).

In November 2012 Foster experienced "hip discomfort after prolonged walking over the weekend;" no mention was made of her use of a walking or other assistive device. (Tr. 458). The following week, Foster reported right hip pain after prolonged

10

standing in a store for about two hours. (Tr. 459). By late November 2012 Foster reported that her hip was "feeling pretty good" (Tr. 460), and that she experienced "decreased right hip pain and improved tolerance with walking and climbing stairs while doing laundry." (Tr. 461).

Also in November 2012 Foster was discharged from physical therapy for her knee condition "secondary to progressing toward goals;" it was noted that her long term prognosis was "good." (Tr. 404). Dr. Kohen noted that Foster did "not have a striking hip limp but she does have pain in her hip on flexion and internal rotation," and that "her x-rays are not that striking but I think she does have a component of hip pain." (Tr. 479). He further found that Foster's obesity played a role in her pain, and recommended that she "put up with her symptoms as much as possible," and to "manage her hip conservatively at this point." (*Id*.).

In a mid-November 2012 hip evaluation, it was found that Foster could walk or stand for forty-five minutes, and could take stairs occasionally by bearing weight on the left side. (Tr. 480). Foster's pain ranged between zero to four out of ten. (*Id*.). Her prognosis and rehabilitation potential were both "good." (Tr. 481). Also in November 2012, Dr. Bartholomew wrote that Foster was having "some discomfort" about her right hip, but on the whole was "doing well with her right knee total arthroplasty. (Tr. 483). Foster reported only two out of ten pain, and her physical therapist noted overall function at one hundred percent of normal, but with some right hip pain. (Tr. 484). Foster's walking was "limited secondary to hip pain," but she had "no difficulty with knee." (*Id*.).

11

Her sleeping was improved through the use of medication. (*Id.*). Having progressed towards her goals, Foster was discharged from physical therapy. (*Id.*).

In early December 2012 Foster again reported knee discomfort. (Tr. 462). In mid-December 2012 Foster reported "right groin pain after going up/down stairs five times to do laundry yesterday." (Tr. 464). Dr. William Kohen noted that Foster's "hip was still bothering her but she . . . improved with physical therapy and is actually doing a lot better." (Tr. 477). In a rehabilitation report Foster complained of only three out of ten pain, and was functioning at eighty-five percent of normal. (Tr. 478). The report also recorded that Foster had not attempted to walk more than twenty minutes, though this appears to be contradicted by her November 2012 reports. (*Id.*).

In August 2013 Foster suffered a fall and experienced some pain in her right hip. (Tr. 471, 474). An MRI showed moderate osteoarthritic changes of the right hip with subchondral cystic changes at the aoetabular roof and a possible tear of the superior labrum." (Tr. 471-73). Her left knee showed signs of degenerative joint disease, whereas the right knee "reveal[ed] the right total knee arthroplasty in excellent position." (Tr. 474). In September 2013 she was treated with a pain relieving injection to the hip. (Tr. 468). The administering physician noted that it was "interesting" that Foster did not show any abnormal findings in her hip, and thus was not a candidate for arthroplasty. (Tr. 468-69).

### 2.      Application Reports and Administrative Hearing

#### a.      Foster's Function Report

Foster completed a function report on an unknown date, in which she asserted that her illnesses caused pain when walking up and down stairs. (Tr. 206). Foster reported that she washed up, cooked breakfast, cleaned the kitchen, helped clean the house, rested, helped with dinner, took care of her cat, and helped to take care of her grandchildren. (Tr. 207). Foster had no problems with personal care, and could prepare "complete meals most of the time," which took about an hour to prepare. (Tr. 207-08). She did not perform yard work, but did "do dishes, vaccume [sic], laundry, [and] my grand daughters carry baskets for me." (Tr. 208). Washing laundry took "all day," and she performed that task once weekly. (*Id*.). She was unable to carry heavy baskets or dishes. (*Id*.). Foster could drive, but as to leaving home, she reported that she "s[at] on [the] porch all day." (Tr. 209). She shopped in stores monthly for about three hours per trip. (*Id*.). Her hobbies included "reading playing with my grandchildren like games an [sic] cards," and she performed these activities three to four times a week. (Tr. 210). In terms of social interaction, she received visits from family, talked to friends by phone, and went to "family functions when there [was] one." (*Id*.). Foster wrote that she experienced difficulties with lifting, squatting, bending, standing, reaching, walking, kneeling, and stair climbing, resulting from shoulder tenderness and weakness, and leg pain. (Tr. 211). She could walk for "about 5 min[utes]," and required a five minute rest before continuing. (*Id*.). In the remarks section, Foster noted that she was scheduled for a right knee replacement, and would likely need a left knee replacement because it was "bone on bone." (Tr. 213).

13

b.      **Foster's Testimony at the Administrative Hearing**

At the November 7, 2013, hearing before the ALJ, Foster testified that she last worked in 2012, and previously worked in the Walmart accounting office as a head cashier. (Tr. 35). She left that position and returned to Walmart some years later, but was not permitted to return to her prior position, and was instead permitted to work as a cashier. (Doc. 33-35). She left the position just a few days later as she was unable to tolerate the standing and lifting required by the cashier position. (*Id*.). Her work as a head cashier, by contrast, was generally performed while seated, and required that she lift only ten to fifteen pounds a few times per day. (Tr. 36).

Foster also testified that she has limitations "to a certain extent" with regard to her shoulder following the repair of her rotator cuff, in that she cannot lift "something very heavy." (Tr. 37). With regard to walking, Foster said she had "a hard time" with steps and "extended walking." (Tr. 38). She used a walker "[w]henever it's rainy" and after climbing stairs. (Tr. 39). As to activities of daily living, Foster could cook, do the dishes, wash laundry, perform personal care activities, and clean her home. (Tr. 39-41). Foster testified that she could perform a job where she sat for six-and-one-half hours per day, but would have difficult working without a sit-stand option. (Tr. 41-42).

c.      **The VE's Testimony at the Administrative Hearing**

The ALJ then called upon the services of a VE to determine Foster's ability to perform work. The ALJ first asked the VE to characterize Foster's past relevant work.

14

(Tr. 43-44). The VE found that Foster's work as a head cashier was sedentary work performed at a light level of exertion.[1] (Tr. 43).

The ALJ asked the VE to assume a hypothetical individual who was limited to sedentary work; who could occasionally climb, stoop, crouch, or balance; but who should not be required to kneel, crawl, or use ladders, ropes, or scaffolds; who could occasionally reach above shoulder height with the left upper extremity; and who should avoid concentrated exposure to extreme cold or wetness. (Tr. 44-45). The VE found that such a worker could perform Foster's past relevant work as a head cashier, as that position is customarily performed, per the Dictionary of Occupational Titles ("DOT"). (Tr. 45). The position could also be performed if the worker was limited to occasional reaching with the upper left extremity. (*Id*.). However, the worker could not perform that work if she required more than two absences monthly. (*Id*.).

Foster's attorney then asked the VE whether the hypothetical worker could perform work as a head cashier if the worker was required to stand for six-and-one-half-hours per day and required use of a walker. (Tr. 45). The VE found that such a restriction would preclude work as a head cashier. (Tr. 46). However, the VE also noted that the head cashier position was defined as a sedentary position in the DOT, and thus would not require extended standing. (*Id*.). Foster herself testified that the head cashier position was performed "[b]asically seated." (Tr. 47).

---

[1] The ALJ also evaluated Foster's past work as a cashier, home health attendant, and food cashier, but those findings are not relevant to the ALJ's decision or Plaintiff's brief, and thus need not be discussed in this analysis. (Tr. 43).

F.      **Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both    "acceptable"    and    non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and

the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §

17

404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating
> source's medical opinion, supported by the evidence in the case
> record, and must be sufficiently specific to make clear to any
> subsequent reviewers the weight the adjudicator gave to the treating
> source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For

example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41

(E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995)

(unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's

statements about pain or other symptoms with the rest of the relevant evidence in the

record and factors outlined in Social Security Ruling 96-7p. Credibility determinations

regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of

Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's

credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r

of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith

v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d

387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL

18

374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

19

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G. Analysis

Foster argues that the ALJ erred in the following ways: 1) Erroneously finding that Foster did not meet or equal Listing 1.02A despite her difficulties ambulating; 2) Improperly evaluating Foster's complaints of pain and activities of daily living; and 3) Failing to grant a closed period of disability between November 2011 and February 2013. (Doc. 9 at 7-11). These arguments will be addressed in turn.

20

     **1.**    *The ALJ Did Not Err by Finding that Foster Did Not Meet or Equal a Listing*

Foster first argues that the ALJ erred by improperly determining that she did not meet or equal one of the medical listings, in particular, Listing 1.02A. (Doc. 9 at 7-8). Listed impairments are those which the SSA considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In other words, "a claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). The listings include the "objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). A claimant may also be found disabled where their conditions are at least equal in severity and duration to the listing's criteria. *Reynolds*, 424 F. App'x at 415. In evaluating whether a claimant equals a listing, the ALJ must "evaluate the evidence, compare [the relevant] Listing, and give an explained conclusion, in order to facilitate meaningful judicial review." (*Id.* at 416).

Listing 1.02 covers "major dysfunction of a joint[]." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Listing 1.02A is met where the following criteria are satisfied:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A. Section 1.00B2b, in turn, defines inability

"to ambulate effectively" as follows:

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02B2b.

A claimant bears the burden of proof through Step Four of the sequential evaluation process, thus it is Foster's burden to demonstrate why she meets Listing 1.02A at Step Three. *Jones*, 336 F.3d at 474. Foster asserts that she lacks the ability to ambulate effectively without the use of a walker because she "has degenerative joint disease of both knees, is status-post right total knee replacement, has significant osteoarthritis of the right hip . . . and weighs in excess of 260lbs," and because she "testified at her hearing that she has to use her walker when she goes out of her house." (Doc. 9 at 7-8).

Contrary to Foster's assertions, the medical record does not support a finding that she cannot effectively ambulate without the use of a walker. As the Commissioner notes

22

in her particularly thorough and persuasive brief, Foster made use of a walker for, at most, a few months following her August 2012 knee surgery. (Doc. 11 at 16-17). In September 2012 she could walk for fifteen minutes at a time with the aid of a rolling walker. (Tr. 310). By November 2012, Foster complained of "hip discomfort after prolonged walking over the weekend," with no mention of a walker. (Tr. 458). In late November 2012 she reported "increased tolerance with walking and climbing stairs while doing laundry." (Tr. 461). She was discharged from physical therapy later that month. (Tr. 404). Dr. Kohen noted around that time that Foster had some pain in her hip on rotation and flexion, but did not walk with a "striking hip limp." (Tr. 479). While Foster's obesity played some role in her lower extremity pain, Dr. Kohen recommended that Foster "put up with the symptoms as much as possible," and found that her hip pain could be managed conservatively. (*Id*.). Other evaluations noted that Foster had returned to one hundred percent of normal function in her knee. (Tr. 484). In mid-December 2012 Foster reported some pain after taking walking five sets of stairs up and down in the process of doing laundry. (Tr. 464). Dr. Kohen noted that she had some hip pain, but was "actually doing a lot better." (Tr. 477).

While not part of the administrative record for the purposes of this review, it is also noteworthy that by July 2013, it was specifically noted that Foster was not making use of a walker, cane, or wheelchair. (Tr. 497-98). Foster was thus not reliant upon the use of a walker for more than a year, and was not disabled under the Act by her

temporary use of a walker. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007).

As to Foster's assertion at the hearing that she was reliant upon the use of a walker when walking outside of the home (Doc. 9 at 7-8), the ALJ's credibility findings and review of the medical evidence adequately address this contention.  The ALJ specifically notes the consistent improvement in Foster's knee pain throughout her treatment notes, the gap in treatment for knee pain between November 2012 and August 2013, and that despite sustaining a fall in August 2013, tests showed good strength and stability, which suggests that Foster is exaggerating the limiting effects of her right knee pain. (Tr. 21-22). Likewise, the ALJ noted that Foster's left knee and hip pain was not disabling, and was adequately addressed by conservative treatment. (*Id*.). The ALJ thus gave sufficient reasons to doubt the credibility of Foster's recitation of her symptoms, and thus was free to discount her alleged need for continuing use of a walker. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.").

### 2.      *The ALJ's RFC Finding Was Supported by Substantial Evidence*

Foster's next argument is somewhat unclear. She begins with the broad assertion that "The Decision of the ALJ is not supported by substantial evidence," followed by a short recitation of the ALJ's findings and a lengthy series of quotations establishing the standard of review. (Doc. 9 at 8-9). Foster next references the importance of subjective

24

complaints given "the nature of fibromyalgia," which is puzzling given that she does not suffer from fibromyalgia. The thrust of Foster's argument is contained in the final paragraph of the section, stating that:

> In the present case, the ALJ's consideration of Plaintiff's subjective pain complaints and assessment of her credibility do not comport with the Administrative record. The findings do not comport with or portray the reality of the Plaintiff's circumstances. She does shop, however, she uses her walker when she leaves the house. She does clean and care for herself, and maintains her house, however, she does these activities at her own pace. She watches television, reads, and plays games with her grandchildren three of four times per week. These activities are not [a] sufficient basis for the ALJ to conclude that the Plaintiff is not precluded from performing her past work.

(*Id.* at 10). In essence, Foster appears to argue that the ALJ erred by finding that her activities of daily living demonstrated that she was not precluded from all work activity.

Inconsistency may be found where a claimant attests to performing activities which conflict with the functions they allege are severely impaired. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004). For instance, a claimant who asserts that they cannot perform any work overhead might be found to have contradicted themselves where they also attest that they can put away dishes in overhead cabinets without difficulty. This contradiction is less apparent where, as here, the claimant does not establish a precise set of activities which her ailments preclude her from performing. Foster merely points to portions of the medical record indicating that she suffered from knee, hip, and shoulder pain, but does not assert that the ALJ failed to find that she suffers from a particular ailment or limitation. (Doc. 9 at 7-11). Nevertheless, it is

25

difficult to square Foster's assertion that she can walk for only five minutes with her admission that she shops in stores for several hours at a time, can walk flights of stairs to do her laundry, and attends family functions. (Tr. 207-11).

Even assuming, *arguendo*, that the ALJ's credibility finding was somehow lacking, the ALJ has pointed to sufficient evidence in the medical record indicating that Foster's ailments are no more severe than provided for in the ALJ's RFC finding. The ALJ points to substantial evidence in the record that Foster's shoulder impairment was effectively eliminated through surgery and treatment (Tr. 21, 279, 321), that her right knee was substantially improved by surgery and rehabilitation therapy, ultimately returning to normal function (Tr. 21-22, 404, 484), and that her left knee and hip pain produced only minimal limitations (Tr. 22, 471-74).

### 3.     *The ALJ Properly Declined to Grant a Closed Period of Disability*

Finally, Foster argues that the ALJ improperly failed to grant a closed period of disability between November 2011 and February 2013. (Doc. 9 at 10-11). Foster asserts that, because she endured shoulder and knee surgery during this time, and because she "underwent extensive physical therapy for her shoulder, knee, and hip," she was disabled during that period. (*Id*.). As the Commissioner aptly points out, the record simply does not support a finding of disability between those dates, and the ALJ made proper note of Foster's consistent improvement. (Doc. 11 at 23-25). While Foster may have been disabled from work for a period following her December 2011 shoulder surgery (Tr. 297) and August 2012 right knee surgery (Tr. 344), she recovered quickly from both surgeries

26

and saw good results from her treatment. Only one month after her shoulder surgery, Foster's shoulder pain was reduced to three or four out of ten (Tr. 287), and generally reported improvement in her shoulder symptoms (Tr. 289-91). Dr. Bartholomew drafted a note stating that Foster would be disabled from work until February 19, 2012. (Tr. 326). By late February Foster's shoulder was "getting better overall" (Tr. 279), and there is little mention of her shoulder in the record following March 2012.

Just one month after her August 2012 right knee surgery, Foster saw substantial improvement in her right knee; tests of her knee strength showed roughly four out of five strength bilaterally on flexion and extension. (Tr. 311). By November 2012 Foster was engaging in "prolonged walking," and standing for two hours at a time, though such activity produced some hip discomfort. (Tr. 458-59). Later that month she was discharged from physical therapy, having made significant progress towards her goals. (Tr. 404). Dr. Kohen noted that she did not have a striking limp at that time (Tr. 479), and D.O. Bartholomew found that Foster had "no difficulty with [her] knee" (Tr. 484). Foster had some hip and knee pain in December 2012. (Tr. 462-64). Foster evidently did not again seek treatment for her lower extremity pain until August 2013, at which time she sought treatment for a fall. (Tr. 471-74).

In short, there was no twelve-month-period between November 2011 and February 2013 during which Foster was disabled, thus the ALJ did not err by not granting a closed period of disability during that time. *See Macielak v. Comm'r of Soc. Sec.*, No. 13-CV-10148, 2013 WL 6839292, at *9 (E.D. Mich. Dec. 27, 2013) (noting that a claimant must

27

be disabled for at least twelve months to qualify for a closed period of benefits). The ALJ's decision was thus supported by substantial evidence, and should be affirmed.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Foster's Motion for Summary Judgment (Doc. 9) be **DENIED**, the Commissioner's Motion (Doc. 11) be **GRANTED**, and that this case be **AFFIRMED**.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

28

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 6, 2016                          S/ PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge

### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 6, 2016                           By s/Kristen Krawczyk
                                              Case Manager

29